IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATHAN J. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-96-NJR-DGW |
| | ) | |
| PHILLIPS 66 COMPANY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is a motion for summary judgment filed by Defendant Phillips 66 Company ("Phillips 66" or "the Company") on May 6, 2014 (Doc. 59).   Also pending is a motion filed by Phillips 66 on June 12, 2014, in which Phillips 66 seeks to strike various exhibits submitted by Plaintiff Nathan Williams as part of his response to the motion for summary judgment (Doc. 67).   On September 22, 2014, the Court held a hearing on these motions.   For the reasons set forth below, the motion for summary judgment is granted in part and denied in part, and the motion to strike is denied as moot.

## FACTUAL BACKGROUND

Neither party presented a comprehensive statement of facts, which, given the

---

[1]  The Notice of Removal indicates that ConocoPhillips Company and Phillips 66 Company were split into two distinct corporations in May 2012, and the proper name of the Defendant is Phillips 66 Company (Doc. 2).   The Clerk of Court is directed to correct the docket sheet to reflect the proper name of Defendant.

nature of this case, is essential at this stage of the litigation.   Consequently, the Court has endeavored to create one based on all of the evidence submitted by both parties.

Nathan Williams is African American.   He was hired on April 23, 2001, by Phillips 66 to work as an operator at the refinery in Wood River, Illinois, in the North Property Logistics Dispatching Department (Doc. 60-1, pp. 3, 4, 12).   To the Court's knowledge, Williams is currently still working as an operator in the Dispatching Department (*Id.* at pp. 3, 5).

As an operator, Williams's job is to route finished products to the correct storage tanks (*Id.* at pp. 4–5).   At his deposition, he described himself as "pretty thorough at work . . . [and] pretty safe" (Doc. 60, p. 5).   Williams believes that he has always been able to do what is required of an operator and performed his job satisfactorily (Doc. 60-1, pp. 5, 7).   He has been evaluated from time to time at work, and his evaluations have been positive (*Id.* at p. 6).   Williams has never been suspended (*Id.* at p. 21).   He has never been demoted (*Id.*).   He has never had a reduction in pay or benefits; in fact, his pay has consistently and steadily increased from 2001 to 2014 (*Id.* at p. 3; Doc. 60-5; Doc. 64-9, p. 5).   Williams indicated that he liked being an operator and intended to continue working as an operator at the Refinery (Doc. 60-1, pp. 7–8).

While one might think this is all evidence of a positive work environment, Williams claims that is far from true.   Williams alleges that since he began working at the Refinery in 2001, he has been subjected to a continuing pattern of harassment, retaliation, and discrimination due to his race (Doc. 30).   Williams filed nine formal complaints with the Human Resources Department ("HR") at the Refinery between 2001

and 2010 (*See* Doc. 64-2, ¶¶ 10, 11).   There were also incidents where Williams complained only to his supervisor and his complaint was not passed on to HR, and there were incidents that Williams did not report to anyone.   The following is a summary of the incidents, recounted in a light most favorable to Williams, the non-movant.

Shortly after Williams began working at the Refinery, the harassment began in the form of offensive race-based comments.   In October 2001, Gary Liley, one of Williams's co-workers, said "all you black guys look and sound alike" (Doc. 60-2, p. 16). That same month, another co-worker, Richard McCormick, said, "If you are making remarks about Blacks, Hispanics, or Portaricans [sic] then the company is ready to nail you to the cross" (*Id.*).   Another time, Williams was listening to music and McCormick said that he didn't think "you people" or "you black folk" listened to that type of music (*Id.* at pp. 16, 19; Doc. 64-10, pp. 2–3).   McCormick also asked Williams why "black people get upset when people call them 'nigger'" because he "had a high school friend that he called 'nigger' all the time" and "his friend never got upset" (Doc. 60-2, p. 16; Doc. 64-9, pp. 3, 4).   Another time, McCormick was complaining over the phone about Williams's heavy use of the radio, and said, "this guy stays on the radio 24/7.   The only reason these people got hired was because [sic] minorities" (Doc. 60-2, p. 17). McCormick then grabbed a pamphlet with a picture of new hires at the Refinery and pointed out all of the women and minorities (*Id.*).

Williams also was involved in the first of many confrontations with McCormick in October 2001 (Doc. 60-2, p. 16, 19).   McCormick confronted Williams because he was unhappy with the way Williams handled a situation at work.   McCormick had a

"heated discussion" with Williams and said, "this is not the way we do things around here, and it [is] time that I show you who is boss, boy."   McCormick also told Williams to never again talk to him or ask him for help on the job.   Williams reported the incident to his Production Lead, Ruben Avilez, and Avilez said he could talk to McCormick, but it might result in negative repercussions for Williams (Doc. 60-4, p. 27).[2]

Williams filed an internal complaint against Liley and McCormick related to these incidents, and Joe Wade from HR was assigned to investigate (*see* Doc. 60-2, pp. 13–21). Williams told Wade that offensive incidents occurred every day, but if he wrote them all down, then he would be spending more time writing than working (*Id.* at p. 17; Doc. 64-10, p. 4).   As part of his investigation, Wade interviewed Liley, McCormick, and two other operators (Doc. 60-2, p. 15).   He also obtained two written statements from Fred Carpenter, who was the off-site supervisor to whom Williams initially complained (*Id.* at pp. 18–19).   Joe Wade concluded that the events Williams described were "substantially correct" (*Id.* at p. 14).   He recommended a one-day suspension with pay for McCormick and a verbal reminder for Liley (*Id.*).   Phillips 66 did not present any evidence regarding what, if any, disciplinary measures were actually taken.

Sometime after this, although Williams was unsure of the precise year,[3] Williams overheard Liley refer to him as a "nigger" during a conversation with the supervisor, Ruben Avilez (Doc. 64-9, p. 4).   Liley said, "We have to get a handle on this nigger filing

---

[2]   The Court notes that there are references to "Pablo Avilez" and "Ruben Avilez" in the record. For example, in the EEOC Charge, Williams states that his direct supervisor is "Pablo Avilez, Production Lead" (Doc. 60-2, p. 3).   However, the notes from Fred Carpenter's October 2010 investigation indicate that he interviewed "Ruben Avilez, North Property Production Leader" (Doc. 60-4, p. 6).   The Court believes that Pablo and Ruben Avilez are one in the same.

[3]   According to Phillips 66, this incident occurred in 2005 or before (Doc. 60, p. 4).

these different charges."   Avilez responded, "You don't have to worry about Nate, I'll take care of him."   Williams did not file a complaint related to this incident.

In 2002, a third co-worker made an offensive comment to Williams (Doc. 64-10, p. 2).   Specifically, Stan Unverzagt said "we don't train your kind," and when Williams asked what he meant, Unverzagt said "go look in the mirror."   Williams followed protocol and reported the incident to his supervisor, Ruben Avilez, and Avilez said he would handle it.   Phillips 66 did not produce any evidence or provide any details regarding its response to this incident, or whether Unverzagt was disciplined.[4]

In addition to racially charged comments from his co-workers, Williams suffered other disadvantages in the workplace.   For example, in December 2004, Williams applied for an open position at the Refinery as a Dispatch Utility Day Operator (Doc. 60-4, p. 27; Doc. 64-11, pp. 4–5).   Williams wanted the job because it was a day-time shift, and it would allow him to spend more time with his family.   Williams possessed all of the requisite qualifications for the job, but he was not hired.   Instead, a white man named Alan Shook was hired, even though he did not have any of the necessary qualifications.   To add insult to injury, Williams had to temporarily fill the position for four or five months while Shook was properly trained for the job.

Williams also indicated that he has been involuntarily reassigned to the "distillate job," but he does not recall when the reassignment occurred (Doc. 64-9, p. 5).   Every qualified operator is expected to take turns working the distillate job, and operators

---

[4] In his responses to Defendant's interrogatories, Williams indicated that he filed an internal complaint in 2004 (Doc. 60-4, p. 24).   However, neither party produced any further details or evidence regarding that complaint.

receive the same pay and same benefits while working the distillate job.   But Williams claims he was reassigned to the distillates job for six months to one year, which is longer than other operators are assigned to the job.

By 2005, the explicitly race-based comments from his co-workers had mostly stopped, but Williams continued to be harassed in other ways.   For example, in August 2005, Larry Odorizzi put a sticker on Williams's desk that said "gay operator" (Doc. 64-10, pp. 4–5).   Williams filed an internal complaint, and Lynette Zirges from HR was assigned to investigate.   Ms. Zirges concluded that Williams's claim was substantiated, and she recommended disciplinary action for Odorizzi.   Phillips 66 did not produce any evidence or provide any details regarding its investigation of this incident or the disciplinary action that was taken against Odorizzi.[5]

Also in 2005, a hangman's noose was found at a workstation at the Refinery (Doc. 60-4, p. 24; Doc. 64-10, p. 6).   In response to the incident, the Company distributed to all employees a memorandum entitled "Avoiding Harassment in the Workplace—Inappropriate Displays."   The memorandum reminded employees that inappropriate displays were unacceptable and would result in discipline.   Phillips 66 did not produce any evidence or provide any details regarding this incident, its investigation and the manner in which it was conducted, or whether any disciplinary action was taken.

---

[5] In the Amended Complaint, Williams alleges that he filed another internal complaint in August 2005 alleging racial harassment and hostile work environment (Doc. 30, p. 4).   He further alleges that on August 31, 2005, Susan Hamilton and Savanna Sam from HR investigated, and concluded that Williams's claims were substantiated (*Id.*).   At his deposition, Williams could not remember the specifics of the incident (Doc. 64-10, p. 7).   Phillips 66 did not produce any evidence or provide any details regarding its investigation of this incident and the manner in which it was conducted or whether any disciplinary measures were taken.

In March 2006, Williams's locker was broken into (Doc. 60-4, p. 24). Williams reported the incident to management, which Gary Liley "was not pleased" about. No one was ever punished. Phillips 66 did not produce any evidence or provide any details regarding how or when it responded to this incident or whether any disciplinary or preventative action was taken. During a subsequent investigation over four years after his locker was broken into, Williams indicated that his locker was still broken because Ruben Avilez refused to fix it (Doc. 60-3, p. 15).

In April 2008, Alan Shook and Gary Liley circulated a political email with the subject line "Comparison of Federal Taxes McCain vs Obama and Clinton" (Doc. 60-2, p. 22; Doc. 60-1, pp. 44–46). Williams explained that the email discouraged voting for Barack Obama in the presidential election, that it had racial undertones, and that he was offended by it. Williams filed an internal complaint, and the Company apparently launched an investigation. But again, Phillips 66 did not produce any evidence or provide any details regarding the investigation or whether disciplinary action was taken against Shook and Liley.

In January 2009, an ice pick was jammed into one of the tires on Williams's car while it was parked at the Refinery (Doc. 60-4, p. 24; Doc. 64-11, p. 3). Williams reported the incident to security at the Refinery and also to Fred Carpenter in HR. Phillips 66 did not produce any evidence or provide any details regarding how or when it responded to this incident or whether any disciplinary or preventative action was taken.

After January 2009, most of the harassment Williams suffered seemed to come in the form of threatening or otherwise inappropriate confrontations with co-workers. For

example, in June 2009, Williams was involved in a confrontation with his co-worker, Dave Mendoza (Doc. 60-2, pp. 28–29, 34–35; Doc. 64-11, pp. 6–8).   Mendoza and Williams showed up to work the same position, and Mendoza tried to order Williams to relocate, but Williams refused.   They called the "off shift supervisor," Rich Tolleson, to straighten out the situation.   Before they got an answer, Mendoza cursed at Williams and stormed out of the room.   Tolleson then accused Williams of being disrespectful and insubordinate, even though Williams was the one who was in the right place according to the schedule.   Another operator told Williams that she overheard Mendoza threatening to file a union grievance if Tolleson did not write up Williams, and Tolleson said not to worry because he was going to.   Williams was called into Ruben Avilez's office two days after the incident, and Avilez stated "we can let Mendoza retire, but you can be fired."   Williams interpreted this statement as a threat.

Williams filed an internal complaint related to the incident (Doc. 60-2, p. 28). Williams indicated that he felt certain members of management and the union were "out to get [him]" or "after [him]," and that the Refinery had an ongoing problem with racial harassment and discrimination (*Id.* at pp. 28, 34, 35).   HR asked for someone from the corporate office in Houston, Texas, to investigate Williams's complaint, and Jermaine Davis was sent to do so (Doc. 64-12, p. 1).   As part of his investigation, Davis met with Williams, obtained statements from Rich Tolleson and a witness, and reviewed a number of pertinent documents, including the overtime schedule for the night in question, portions of the Refinery's operational guidelines, and a couple of emails (*see* Doc. 60-2, p. 27–50).   Davis concluded that Williams's claims were without merit; there

was no evidence that anyone was conspiring against Williams, and the investigation "did not confirm" that Williams was subjected to a hostile work environment or racial discrimination (*Id.* at pp. 31, 32). Nevertheless, Davis found that "it seem[ed] appropriate to educate the workforce on our policies regarding workplace harassment and discrimination" (*Id.* at p. 32). Davis also recommended formal counseling for Mendoza due to his "inappropriate conduct" (*Id.*).

In October 2010, there was an incident between Williams and an independent contractor named "Gator" Gaines over a safe working permit (Doc. 64-12, pp. 4–6). Gaines was hired to do some work on a tank, but Williams would not issue a safe work permit and allow Gaines to get started until the tank was tested to ensure there was no liquid or hydrocarbons in the tank. Gaines cursed at Williams and was angry that Williams was slowing him down. Williams believes this incident was related to his race because Gaines "was calling [him] names like 'boy.'" Williams reported the incident to a supervisor, Mike Gutierrez, and an investigation was apparently launched (*Id.*; *see* Doc. 64-2 ¶ 10). Phillips 66 did not produce any evidence or provide any details regarding its investigation of this incident or the manner in which it was conducted. But Phillips 66 told the EEOC that Gaines was prohibited from returning to the Refinery (Doc. 64-7, p. 3).

There was also another incident in October 2010 between Williams and Richard McCormick (Doc. 60-4, p. 25; Doc. 64-12, pp. 3–6). McCormick wondered aloud to a new hire whom he was training, "I wonder who is next on Nate's list." Williams asked McCormick what he meant, and McCormick stated that someone got in trouble every

time Williams came around.  Williams told McCormick that was not true and asked him not to make comments like that in front of a new operator.  McCormick, who weighs approximately 300 pounds, "got up in [Williams'] face"—he was pointing his finger in Williams's face and barked that Williams has gotten another co-worker fired. Williams felt that McCormick was threatening him and essentially telling him that he "better watch it."  Williams believes this incident was related to his race because McCormick called him "boy", and McCormick does not get into confrontations with white co-workers.  Williams testified "I hate to admit this, but [McCormick] kind of intimidated me a little bit. . . . [H]e's got friends out there and I'm going to work every day and I'm watching over my shoulder."  Williams further testified that he cannot sleep and he had to go to the hospital with chest pains for the first time in his life.

Williams reported the incident with McCormick to his supervisor, and his complaint made its way to the HR Department (Doc. 64-12, p. 7).  Williams complained that he was subjected to retaliation by coworkers and managers because of his previous complaints (Doc. 64-7, p. 3).  He complained that he was isolated and routinely treated differently and that his co-workers made disparaging comments about him to new hires and encouraged the new hires not to associate with Williams (*Id.*)  Fred Carpenter launched an investigation into Williams's complaint (Doc. 64-2, ¶ 10).

While Carpenter's investigation was ongoing, there were more incidents. Williams and McCormick were involved in another confrontation in December 2010 (Doc. 60-2, p. 3; Doc. 60-4, p. 25; Doc. 64-13, pp. 3–6).  Williams relieved McCormick from the volatiles job, which, as the name implies, is extremely dangerous.  Williams

explained that "you leave a valve open, you leave a pump running, a spark goes off, that's the end of Nate Williams."   As Williams was conducting his surveillance, he noticed that McCormick had left a pump "dead-heading," and he also had left a propane valve open.   Williams corrected the problems and noted them in his shift report, as he is required to do.   The next day, McCormick printed Williams's shift report and "was not too happy that [Williams] put [his] findings in that shift report."   McCormick approached Williams, who was sitting in a chair, and stepped in between his legs. McCormick was "pointing and yelling," and Williams "didn't know if the guy was going to hit me or what have you."   Williams was very uncomfortable with how close McCormick was to him, and he pushed his chair back and asked McCormick to step back.   McCormick told Williams, "I'll be seeing you tonight" and walked out. Williams was very concerned because he did not know what McCormick meant, and he had "no idea what he [was] gonna do next."   Williams reported the incident to his shift supervisor; he was told that the management team was "putting together a plan." Again, Phillips 66 did not produce any evidence or provide any details regarding its response to this incident or whether any disciplinary or preventative action was taken.

Also in December 2010, Williams's prescription medication was stolen from his lunch box (Doc. 60-4, p. 25).   Williams reported the incident to management, and he claims that an investigation was conducted, but the culprit was never caught.   In February 2011, Williams's prescription medication was stolen from his lunch box for a second time.   Again, Williams reported the incident to management, and an investigation was supposedly conducted.   Phillips 66 did not produce any evidence or

provide any details regarding its investigation of either incident.

Additionally, sometime during 2011, Alan Shook wrote "Obama" and "Gina Nicholson" on a picture of a monkey and hung the picture on the wall in the control room (Doc. 60-4, p. 26).   Ms. Nicholson was the only African American manager at the refinery.   Phillips 66 did not produce any evidence or provide any details regarding this incident, including when (or if) an investigation was conducted or whether any disciplinary action was taken against Shook.

Fred Carpenter's investigation that began in October 2010 was closed sometime in March or April of 2011 (*See* Doc. 60-2, p. 3; *see* 64-5).   As part of his investigation, Carpenter looked at all of the Dispatching Department's prior investigations and complaints (Doc. 64-2 ¶¶ 15, 16).   He conducted at least thirty interviews, and his notes were approximately 74 pages long (*See* Doc. 60-3; Doc. 60-4, pp. 1–22; Doc. 64-13, p. 1). The final investigation report concluded in part:

> The information documented within this investigation supports that there is sufficient evidence for great concern of an unhealthy work environment present in the Dispatching Department.   Immediate action should be taken to mitigate the atmosphere as the current atmosphere appears to be on the verge of volatility.   During several of the interviews, employees had expressed that they feared that a physical altercation could have or was going to take place.   It was evident during the employee interviews that emotions were nearing a boiling point concerning the issues at hand.

(Doc. 64-5).

In particular, the investigation revealed that new hires received "new guy" talks (Doc. 64-7, p. 3), where they were warned to be careful about what they said and did around Williams.   For example, one stated "I was warned when I started about

Williams' temper and watching what I said and did around him" (Doc. 60-4, p. 10). Another stated that he "got the general new guy speech to watch what you do or say around certain people such as Nate" (Doc. 60-3, p. 6).

The investigation also revealed that four of Williams's co-workers—Dave Mendoza, Alan Shook, Scott Jenkins, and Richard McCormick—had "engaged in inappropriate conduct" (Doc. 64-7, p. 3; *see also* Doc. 64-5; Doc. 60-3 pp. 3–6, 23–26, 45–48). Specifically, those men admitted to treating Williams differently because he had filed previous complaints (Doc. 64-5; Doc. 64-7, p. 3). The final investigation report concluded that Ruben Avilez provided false information during the course of the investigation (Doc. 64-5). And Neil Sahni, the former manager of the Dispatching Department, as well as other supervisors in the Dispatching Department, failed to recognize a hostile work environment and retaliatory actions, and they failed to curtail behaviors and rumors that have had an impact on Williams and others employees in the Department (Doc. 64-5; Doc. 64-7, p. 3).

At the close of the investigation, Carpenter recommended terminating Mendoza, Avilez, Shook, McCormick, and Jenkins (Doc. 64-2 ¶ 23). The Company asked Carpenter to change his report, but he refused to do so (*Id.* at ¶¶ 33, 34), so the Company changed it for him (*see id.* at ¶ 23; *see* Doc. 64-5). In the end, Avilez received a discipline letter stating that his behavior during the investigation was misleading and dishonest (Doc. 64-5; Doc. 64-7, p. 3). Sahni resigned from the Company before corrective action was taken (Doc. 64-7, p. 3). Mendoza, Shook, McCormick, and Jenkins were not individually disciplined (*See* Doc. 64-5; Doc. 64-7, p. 3).

The investigative report also provided that a management plan was going to be developed for implementing a culture change, and that all employees, supervisors, production leaders, and the Director of the Dispatching department were to receive training (Doc. 64-5).   The manager of the Refinery, Jay Churchill, hired an outside firm, Creative Solutions, to assist with the training needs in the Dispatch Department (Doc. 60-2, p. 3; Doc. 64-7, p. 3).   Before the training started, the firm conducted employee interviews to assess the work environment (Doc. 64-7).   During his interview, Williams was offered a transfer to a new department (Doc. 60-2, p. 3).   According to Williams, Jay Churchill authorized the transfer offer (Doc. 60-1, p. 14).   Williams told the Company that he was not interested in the transfer because he liked his job (Doc. 60-1, p. 14). Phillips 66 did not produce any evidence or provide any details regarding the assessment of the environment by Creative Solutions or the trainings that it conducted.

In May 2011, an EEOC investigator helped Williams fill out an EEOC Charge against Phillips 66 for retaliation and racial discrimination (Doc. 60-1, p. 9).   The charge was signed by Williams and dated on May 19, 2011, and filed with the EEOC on May 25, 2011 (Doc. 60-2, p. 3).   Williams did not file any other charge with the EEOC against Phillips 66 (Doc. 60-1, p. 15).

Since filing his EEOC charge, Williams has not had any overt, direct confrontations with co-workers (Doc. 60-1, p. 72; Doc. 64-13, pp. 7–8).   He has, however, felt isolated and shut out of communications.   He is "separated from most people . . . [and] working alone."   His co-workers and supervisors rarely come around.   When he walks into a room, "they hush hush.   Might even walk out."   He stated, "Stay away

from Nate Williams.    That's what I'm getting."

## **PROCEDURAL BACKGROUND**

Williams was notified on September 27, 2012, that his EEOC charge had been dismissed, and he had ninety days in which to file suit (Doc. 30).   Williams filed a timely complaint in the Circuit Court of Madison County, Illinois, on December 19, 2012, against Phillips 66, his labor union, and Ruben Avilez (Doc. 2-1).   Phillips 66 removed the case to this Court on January 30, 2013, based upon federal question jurisdiction (Doc. 2).   The case was randomly assigned to Judge G. Patrick Murphy.   Williams filed an amended complaint on August 9, 2013, against Phillips 66 only, and asserted claims for discrimination, retaliation, and hostile work environment under Title VII, and for intentional infliction of emotional distress under Illinois common law (Doc. 30).   The amended complaint is the operative complaint in this case.

Following Judge Murphy's retirement in December 2013, the case was reassigned to Judge J. Phil Gilbert (Doc. 45).   On May 6, 2014, Phillips 66 filed its motion for summary judgment and a supporting memorandum (Docs. 59, 60).   Two weeks later, on May 20, 2014, the case was reassigned again to the undersigned Judge (Doc. 63).   On May 31, 2014, Williams filed his response to the motion for summary judgment (Doc. 64).   On June 12, 2014, Phillips 66 filed a reply brief, as well as a motion to strike three pieces of evidence that Williams submitted with his response (Docs. 66, 67, 68).   Williams then filed a response to the motion to strike (Doc. 69).   A hearing on both the motion for summary judgment and the motion to strike was held on September 22, 2014, and the motions were taken under advisement.

## MOTION TO STRIKE

Before turning to the motion for summary judgment, the Court will first address Phillips 66's motion to strike.   Phillips 66 seeks to strike three pieces of evidence submitted by Williams with his response in opposition to the Company's motion for summary judgment (Doc. 67, 68).   In particular, the Company seeks to strike various portions of Fred Carpenter's affidavit, his entire supplemental affidavit, and a summary of the report he drafted and submitted to the Company following his investigation of Williams's October 2010 complaint.   In evaluating and ruling on the motion for summary judgment, however, the Court did not rely on any portion of the draft report or any of the contested portions of the affidavits.   Therefore, at this time, the Court need not evaluate the merits of the Company's arguments, and the motion to strike is denied as moot.   The denial is without prejudice, and Phillips 66 can renew its motion prior to trial, if necessary.

## MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party.   Because the primary purpose of summary judgment is to isolate and dispose of

> factually unsupported claims, the nonmovant may not rest on the
> pleadings but must respond, with affidavits or otherwise, setting forth
> specific facts showing that there is a genuine issue for trial.…   A mere
> scintilla of evidence in support of the nonmovant's position is insufficient;
> a party will be successful in opposing summary judgment only when it
> presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted).   No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.   If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

**B.  Analysis**

Williams brought three claims against Phillips 66 for racial discrimination, retaliation, and hostile work environment under Title VII; Williams is seeking punitive damages on these claims.   Williams also brought a claim for intentional infliction of emotional distress under Illinois common law.   Phillips 66 has moved for summary judgment on all four claims, as well as the claim for punitive damages.   The Court will address each argument in turn.

**1.  Racial Discrimination**

In Count Three of the amended complaint, Williams claims that Phillips 66 intentionally discriminated against him because he is African American.   The anti-discrimination provision of Title VII forbids an employer from "so-called discrete acts of discrimination" with respect to an employee's compensation, terms, conditions, or privileges of employment based on the employee's race.   42 U.S.C. § 2000e-2(a)(1);

*Turner v. Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).   An essential element of this claim is that Williams suffered a tangible, adverse employment action as a result of a discrete act of discrimination.   *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014).   Phillips 66 argues that Williams did not suffer an adverse employment action during the relevant time period (Doc. 60).   The Court agrees.

As an initial matter, the Court notes that it need only consider adverse actions that occurred during a limited period of Williams's employment due to the statute of limitations that applies to charges of discrimination.   Specifically, a Title VII suit based on a discrete act of discrimination is limited to acts that occurred within the 300-day period prior to the filing of the EEOC charge.   *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005).   Williams filed his EEOC charge on May 25, 2011 (Doc. 60-2, p. 3).   Thus, the 300-day period for his discrimination claim extends back to July 29, 2010. Consequently, the Court need only consider adverse actions that took place on or after July 29, 2010; any adverse actions that occurred before that date cannot serve as the basis for a discrimination claim.   *See Morgan*, 536 U.S. at 114–15.

The adverse actions proscribed by the anti-discrimination provision are limited to tangible actions that materially alter the compensation, terms, conditions, or privileges of employment.   *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).   This means that the action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities."   *Porter*, 700 F.3d at 954 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d

1106, 1120 (7th Cir. 2009)).   The action must cause "some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm."   *Chaib*, 744 F.3d at 982 (quoting *Nagle*, 554 F.3d at 1116–17).   According to the Seventh Circuit, examples of materially adverse employment actions include a refusal to hire, a termination, a demotion, a failure to promote, and a reduction in pay or benefits. *Porter*, 700 F.3d at 954; *Nagle*, 554 F.3d at 1116–17.

It is undisputed that during the relevant time period, Williams was not discharged, demoted, or disciplined, his pay was not reduced, and he did not lose any benefits.   In fact, his pay has steadily *increased* during the time he has been at the Company.   Williams contends that his temporary reassignment to the distillates job constitutes an adverse employment action (Doc. 64-1, p. 8).   But there are two problems with Williams's argument.   First, Williams failed to put forth any evidence showing that this reassignment occurred on or after July 29, 2010 (*See* Doc. 64-9, p. 5).   Second, Williams failed to put forth any evidence that this reassignment materially altered the terms or conditions of his employment.

A transfer or reassignment alters the terms or conditions of employment and is actionable under Title VII, only if it involves "a demotion in form or substance."   *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 780 (7th Cir. 2007).   In other words, the transfer or reassignment must be accompanied by (1) a reduction in compensation, fringe benefits, or other financial terms of employment; (2) a significant or substantial change in job duties that is likely to diminish the employee's salary or promotion prospects; or (3) an unbearable change in job conditions where the employee is subjected to a

humiliating, degrading, unsafe, or significantly harsher workplace environment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014); *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009); *Nichols*, 510 F.3d at 780.

Williams conceded that his reassignment was not attended by any loss of salary or benefits. He did not make any argument that his new duties were outside the job description for an operator, materially different from his old duties, or required less skill and expertise. He also did not argue that his new position was dirtier, more arduous, less prestigious, or objectively inferior. While Williams claims his reassignment was for a longer period of time than the other operators, he did not put forth any evidence to support this claim. In short, it appears that the distillates job was an essentially equivalent job, and while Williams may have been unhappy with the reassignment, there is no evidence that it caused him material harm.

In conclusion, Williams has failed to establish that he suffered a tangible, adverse employment action during the statutorily relevant time period. Accordingly, Phillips 66 is entitled to summary judgment on Williams's claim for racial discrimination.

### 2. Hostile Work Environment

In Count Two of the amended complaint, Williams claims that he was subjected to a hostile work environment because he is African American. Title VII forbids racial discrimination that creates a hostile work environment. *Orton-Bell v. Indiana*; 759 F.3d 768, 773 (7th Cir. 2014) (citing 42 U.S.C. § 2000e-2(a)(1)). Phillips 66 takes the dreaded and unwise "kitchen sink" approach to arguing that it is entitled to summary judgment on this claim. The Court wades through each of the Company's arguments below.

### a.  Statute of Limitations

Phillips 66 first argues that Williams's hostile work environment claim is time-barred because no race-related incidents occurred within the statutory time period (Doc. 60).   A hostile work environment claim is based on a series of separate acts that are not actionable standing alone, but collectively constitute one unlawful employment practice.   *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 117 (2002).   The same 300-day statute of limitations applies, but it is calculated differently for claims of hostile work environment than it is for claims based on discrete acts of discrimination.   *See id.* at 117.   As previously explained, a plaintiff alleging a discrete discriminatory act will be time-barred if he files his charge more than 300 days after the act occurred; however, a plaintiff alleging a hostile work environment will not be time-barred if some of the acts which make up the claim fall outside the 300-day statutory period, so long as at least one of the acts falls within the time period.   *Id.* at 118, 122.

As previously discussed in this Order, the 300-day period for Williams's hostile work environment claim extends back to July 29, 2010.   So the question is whether any of the alleged acts of racial harassment occurred on or after that date.   The Company argues that all of the race-based comments by co-workers—such as the use of the word "nigger," and the use of phrases like "your people" and "your kind"—occurred no later than 2005, which is well outside of the statutory time period (Doc. 60, p. 12).   But this argument turns a blind eye to the 2011 incident where a picture of a monkey with the names of two African Americans written on it was hung up in the Refinery.   This incident was, without a doubt, motivated by racial animus.   Phillips 66 suggests that the

picture is not relevant to the hostile work environment claim because Williams did not allege that the picture was directed at him or that he even saw it (*see* Doc. 60, p. 7). Phillips 66 is incorrect.   Williams knew about the picture at or around the time it was displayed, which is during the same time period that he was experiencing a hostile work environment.   And while the picture was not specifically directed at him, it was directed at his race.   Therefore, the monkey picture contributed to the hostile work environment and is relevant to Williams's claim.   *See Yancick v. Hanna Steel Corp*, 653 F.3d 532, 545 (7th Cir. 2011) ("[I]ncidents directed at others and not the plaintiff . . . do have some relevance in demonstrating the existence of a hostile work environment." (quoting *Smith v. Sheahan,* 189 F.3d 529, 534 (7th Cir.1999)); *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (holding that the creation of a hostile work environment is actionable under Title VII when the hostility is aimed at a group, or specific members of a group, whom the statute protects); *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000) (holding that incidents of racism are relevant to plaintiff's hostile work environment if plaintiff knew of them).   *See also Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (considering comments made to co-workers in evaluating whether any racial harassment took place during the statutory time period); *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (considering racist graffiti painted on the bathroom walls in evaluating hostile work environment claim).

The Company's argument also ignores incidents that were not explicitly racial, but nevertheless had a racial character or purpose.   *See Yancick*, 653 F.3d at 544 ("To support a hostile work environment claim, the plaintiff need not show that the

complained-of conduct was explicitly racial," only that "it had a racial character or purpose." (citing *Vance v. Ball State Univ.,* 646 F.3d 461, 470 (7th Cir. 2011), *aff'd* 133 S. Ct. 2434 (2013)).   For example, there were two instances within the statutory time period where Williams was confronted and threatened by a co-worker, Richard McCormick. A reasonable jury could conclude that these incidents were motivated by race. Williams testified at his deposition that McCormick called Williams "boy," which is a racial epithet.   Additionally, McCormick had previously used the word "nigger" and said he didn't think "you people listened to that type of music."   Because of McCormick's involvement in previous incidents that were undeniably race-based, a reasonable jury could infer that later incidents involving McCormick were also due, at least in part, to Williams's race.   *See Hall v. City of Chicago*, 713 F.3d 325, 334, n.2 (7th Cir. 2013) (explaining that where one action was motivated by gender animus, the jury was free to conclude that gender animus played a part in all of the subsequent actions); *Raniola v. Bratton*, 243 F.3d 610, 622 (2d Cir. 2001) ("We have held that prior derogatory comments . . . may permit an inference that further abusive treatment by the same person was motivated by the same sex-bias manifested in those earlier comments.")

In sum, there were at least three arguably race-based incidents that occurred within the statutory timeframe and contributed to the purported hostile work environment.   Therefore, the Court finds that Williams's hostile work environment claim is timely, and the Court can consider the entire scope of the hostile work environment, including the acts outside of the statutory time period, in evaluating the

merits of the claim.

### b. Exhaustion

Phillips 66 next tries to limit the scope of the harassing incidents that the Court considers in evaluating the substantive merits of Williams's hostile work environment claim in order to blunt the cumulative force of the conduct. Specifically, Phillips 66 argues that the Court can only consider the acts that were within the timeframe listed in Williams's EEOC charge (Doc. 60, p. 12). Phillips 66 points out that in the box on the EEOC charge labeled "Date(s) Discrimination Took Place," Williams noted that the "earliest" date of discrimination was June 3, 2009, and the "latest" date of discrimination was April 22, and he did not check mark the box labeled "continuing violation" (Doc. 60, p. 12). Therefore, according to the Company, the Court cannot consider any incidents that occurred prior to June 3, 2009, or after April 22, 2011 (Doc. 60, p. 13).

The Court disagrees. As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in the EEOC charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Nevertheless, because employees often file an EEOC charge without a lawyer's help, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.* Title VII plaintiffs are able to pursue claims not explicitly included in the charge so long as they are "reasonably related to the allegations of the charge" and could "be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.*

Here, it is clear from the face of the EEOC charge that Williams was bringing a hostile work environment claim because he complained of harassment by co-workers

(*See* Doc. 60-2, p. 3).[6]   While the charge listed June 3, 2009, as the earliest date of the harassment, the narrative portion of the charge suggests that the harassment began prior to that date; June 3 was simply the date on which Williams complained about the harassment (*See id.*).   Likewise, although the charge listed the latest date of harassment as April 22, 2011, the narrative portion of the charge indicates that Williams continues to be harassed (*See id.*).   Moreover, the harassment that occurred outside the date range given in the EEOC charge involved similar conduct by many of the same individuals, and therefore, it was part of the same actionable hostile work environment complained of in the EEOC charge.   Finally, the Court is firmly convinced that while investigating the allegations in the charge—specifically, Williams's June 2009 complaint, his December 2010 complaint, and Fred Carpenter's investigation that was completed in April 2011—the EEOC would have discovered other instances of harassment by Williams's coworkers due to his race and come to understand that Williams has complained throughout the entire course of his employment about the harassment.   Therefore, although many of the incidents that contributed to the hostile work environment did not occur within the date range listed in the EEOC charge, they are all reasonably related to the allegations of the charge and grow out of such allegations.   Accordingly, in considering Williams's hostile work environment claim, the Court can properly consider incidents not fully described or explicitly included in the EEOC charge.

---

[6]  It is also worth noting that, based on its response to the EEOC charge, it is clear that Phillips 66 understood the charge to include a claim for hostile work environment (Doc. 64-7).   *See Cheek*, 31 F.3d at 500 (explaining that one of the principal functions of the exhaustion requirements related to the EEOC charge is to give the employer some warning of the conduct about which the employee is aggrieved).

### c. Merits Determination—Objectively Hostile

Now that Phillips 66's procedural arguments are out of the way, the Court turns to the Company's arguments related to the merits of Williams's hostile work environment claim.   To survive summary judgment, Williams must demonstrate that there are material issues of fact as to whether: (1) he suffered unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was both subjectively and objectively so severe or pervasive that it altered the conditions of his employment by creating a hostile or abusive working environment; and (4) there is a basis for employer liability.   *See Yancick v. Hanna Steel Corp*, 653 F.3d 532, 544 (7th Cir. 2011); *Vance v. Ball State University*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd* 133 S. Ct. 2434 (2013).

Phillips 66 does not dispute that Williams suffered unwelcome harassment or that he subjectively considered the harassment severe and pervasive.   Therefore, the Court will consider those elements satisfied.

Phillips 66 first argues that the harassment Williams suffered was not objectively severe or pervasive that it altered the conditions of his employment (Doc. 60, p. 13). "There is no bright-line test for determining when a workplace becomes objectively hostile." *Valentine v. City of Chicago*, 452 F.3d 670, 681 (7th Cir. 2006).   To be objectively hostile, "the environment must be one that a reasonable person would find hostile or abusive." *Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004) (quotations omitted). In evaluating the objective severity of harassment, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."   *See, e.g.,* *Cerros v. Steel Tech., Inc.,* 288 F.3d 1040, 1046 (7th Cir. 2002).   Sufficiently severe conduct that occurs only a few times violates Title VII, as does a relentless pattern of lesser harassment that extends over a long period of time.   *Id.* at 1047.

Evaluating these factors, the Court finds that Williams has put forth evidence sufficient to create a genuine issue of fact on the question of whether his work environment was objectively hostile.   Williams was subjected to direct and highly offensive racial epithets and commentary with undeniable racial undertones, such as when he was called "nigger" and "boy," and co-workers said things like "you people" and "your kind."   When the explicitly racial comments stopped, the harassment continued in different forms.   For example, a noose was placed at a workstation.[7]   A poster of a monkey was hung on the wall.   A sticker was placed on Williams's desk that said "gay operator."   Williams was passed over for a position that he was qualified for in favor of a white man who was wholly unqualified.   His co-workers ignored him and made disparaging comments about him to new hires and encouraged the new hires to not associate with him.   He was the target of several heated and aggressive confrontations in which he was cursed at, physically intimidated, and/or threatened by

---

[7] Phillips 66 states in its statement of facts that "Plaintiff has never claimed that the noose . . . was a racially based incident . . . ."   (Doc. 60, p. 5).   The Court is certain that any reasonable jury could conclude that the display of a noose in the Refinery undoubtedly stemmed from racial animus.   See *Porter v. Erie Foods Intern., Inc.,* 576 F.3d 629, 635–36 (7th Cir. 2009).   In *Porter,* the Seventh Circuit explained, in part, that "[t]he noose is a visceral symbol of the deaths of thousands of African–Americans at the hand of lynch mobs."   *Id.* at 636.   "[T]he image of a noose is 'deeply a part of this country's collective consciousness and history, any [further] explanation of how one could infer a racial motive appears quite unnecessary.'"   *Id.* at 635–36 (quoting *Tademy v. Union Pac. Corp.,* 520 F.3d 1149, 1159 (10th Cir. 2008)).

his co-workers.   His locker was broken into.   His prescription medication was stolen on two occasions.   His tire was punctured.   Furthermore, the Company admitted in its own investigative report (which was a sanitized version of Fred Carpenter's original report) that the environment in the Dispatching Department was "unhealthy" and "on the verge of volatility," and that a culture change was necessary (Doc. 64-5).

Adding up the racial epithets directed at Williams with the racist propaganda displayed in the workplace, and coupling that with the verbal harassment, ostracism, physical intimidation, threats, and destruction of Williams's personal belongings that occurred over the course of a decade, a reasonable jury might well find that the events were sufficiently severe *and* pervasive to constitute a hostile work environment.   *See, e.g., Cerros*, 288 F.3d at 1047 (reversing summary judgment for employer on hostile work environment claim where the employee was subjected to an "appalling litany of misconduct," where he was called racially derogatory names, racist graffiti was painted on the bathroom walls, he was talked down to, and the tires on his car were slashed). Therefore, Phillips 66 is not entitled to summary judgment on the hostile work environment claim.   Nonetheless, the Court will go on to consider the Company's other merit-based arguments for summary judgment on the hostile work environment claim.

### d.  Merits Determination—Race Based

Phillips 66 next argues that there is no evidence that the harassment was due to Williams's race (Doc. 60, p. 14).   The Company concedes that the incidents that occurred prior to 2005 were race-based (*see* Doc. 60, pp. 3–5), but argues that the harassment thereafter was completely unrelated to race (Doc. 60, p. 14).   The Court disagrees.

Phillips 66 looks at each instance in isolation and with no regard for the rules of inference on a motion for summary judgment.   Perhaps the most egregious example of this is when the Company refers to the 2008 email sent by Gary Liley and Alan Shook as simply a "political email regarding the tax plans of presidential candidates" (Doc. 60, p. 14).   This contention ignores that one of those candidates, Barack Obama, was African American.   It also ignores that Liley previously used the word "nigger" and said that all blacks look and sound alike; it also ignores the fact that Shook hung up a picture of a monkey with the name Obama scrawled on it.   This conduct permits an inference that unspoken racial animus played a part in sending the email.   *See Hall v. City of Chicago*, 713 F.3d 325, 334, n.2 (7th Cir. 2013).

While the racial connection to some incidents may seem attenuated if the incidents are carved up and separately analyzed, the Court must not consider the incidents in isolation.   *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("We do not focus on discrete acts of individual employees when evaluating a hostile work environment claim, but must consider the entire context of the workplace.")   Each incident is part of a pattern of ongoing harassment that occurred in an admittedly volatile and unhealthy environment which was blatantly racially hostile at times.   Given the totality of the circumstances, a reasonable jury could find that each incident was likely related to Williams's race—even if he was unsure who committed them and there was nothing overtly race-based about them.   *See Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (noting there was no question that a reasonable person would   perceive   that   racist   graffiti,   racist   remarks,   and   other   harassing

conduct—including a tire slashing by an unknown culprit— were based upon plaintiff's race and ethnicity); *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1010 (S.D. Ind. 2004) ("A reasonable jury could also draw the reasonable inference that, in light of the explicit racist character of several incidents, the superficially neutral acts of harassment were also all based on race.")

Because there is evidence from which a reasonable jury could find that the conduct which the Company characterizes as not based on race did indeed have a racial purpose and/or character, Williams's claim for hostile work environment survives summary judgment.

### e.   Merits Determination—Basis for Employer Liability

Phillips 66's final argument is that there is no basis for employer liability.   Under Title VII, an employer's liability for such harassment depends on whether the harasser was a co-worker or a supervisor.   *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013). Harassment by a supervisor triggers strict liability for the employer, but the employer can assert an affirmative defense when the harassment does not result in a tangible employment action.   *Id.*   The affirmative defense requires the employer to show that it exercised reasonable care in preventing and correcting any harassing behavior, and that the employee unreasonably failed to take advantage of opportunities provided by the employer to prevent or correct the harassment.   *Id.*   Conversely, if the harassment is by a co-worker, the employer is liable only if the plaintiff proves that the employer has been negligent either in discovering or remedying the harassment.   *Id.*

There is evidence that Ruben Avilez contributed to the hostile work environment

by essentially reinforcing the harassment, and there is a dispute between the parties as to whether Avilez was Williams's supervisor (*See* Doc. 60-5; 64-3).   The Court finds that there is no reason to analyze and answer whether Avilez was a supervisor because there is another, clear reason for denying summary judgment.   It has already been determined that Williams did not suffer an adverse employment action (*see supra* pp. 19–20).   Therefore, if Williams is right and Avilez was a supervisor, Phillips 66 can escape liability by showing, in part, that it exercised reasonable care in preventing and correcting any harassing behavior.   *Vance*, 133 S.Ct. at 2439.   In other words, Phillips must prove that it was *not* negligent.   *See, e.g.*, RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 3 (2010) ("A person acts negligently if the person does not exercise reasonable care under all the circumstances.")   On the other hand, if Phillips 66 is right and Avilez was not a supervisor, then Williams must show that Phillips 66 was negligent in discovering or remedying the harassment.   *Vance*, 133 S.Ct. at 2439.   Consequently, no matter who is right, the Court has to look at whether Phillips 66 was negligent.   And an issue of fact exists as to whether Phillips 66 was negligent in correcting the harassment.

An employer is negligent, and liable for a hostile work environment, if the employer does not promptly and adequately respond to employee harassment. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011) (citation omitted). "[A] prompt investigation is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Intern.*, 576 F.3d 629, 636 (7th Cir. 2009) (internal quotation marks and citation omitted).   However, "[w]hile promptness is a virtue, an employer must also provide an

appropriate response to an employee's complaints of harassment."   *Sutherland*, 632 F.3d at 994–95.   An "appropriate response" is one that is "reasonably likely to end the harassment."   *Id.* at 995.   "Title VII does not require that the employer's responses to a plaintiff's complaints successfully prevent subsequent harassment," however, "the efficacy of an employer's remedial action is material to [a] determination whether the action was reasonably likely to prevent the harassment from recurring."   *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (internal citations omitted); *accord May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2012).

Phillips 66 argues that each time Williams complained about harassment or discrimination, the Company took the allegations seriously, promptly investigated each and every complaint, and took measures to address the issue and prevent further conflict (Doc. 60, pp. 16, 17).   As detailed in the background section of this Order, however, for a majority of the incidents, Phillips 66 failed to put forth any evidence to support its conclusory assertions that a prompt and thorough investigation was conducted or that action was taken.   Furthermore, based on the evidence that the harassment went on in various forms for over ten years in spite of Phillips 66's purported investigations and disciplinary measures, a reasonable jury could conclude that Phillips 66 did not do enough to end the harassment.   *See May*, 716 F.3d at 971–73. Therefore, Williams's claim for hostile work environment survives summary judgment.

### 3.  Retaliation

Williams asserts a Title VII retaliation claim in Count One of the amended complaint, alleging that his co-workers harassed him in retaliation for complaining

about them to the Company, and the Company did nothing to stop the harassment. The anti-retaliation provision of Title VII forbids an employer from retaliating against an employee who initiates or participates in a proceeding or investigation under that statute. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (citing 42 U.S.C. § 2000e–3(a)). In order to succeed on his retaliation claim, Williams must show that he participated in a protected activity and that he suffered an adverse action as a result of the protected activity. *Tomanovich*, 457 F.3d at 663.

The first question is whether, and when, Williams engaged in a protected activity. A protected activity includes making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing conducted by an official body authorized to enforce Title VII. *Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 747 (7th Cir. 2010). Filing an internal complaint with the employer or participating in the employer's internal investigation is not a statutorily protected activity. *Id*. Therefore, the only protected activity in this case occurred when Williams filed his charge with the EEOC in May 2011 (Doc. 60-2, p. 3). In evaluating Williams's retaliation claim, the Court need only consider adverse actions that occurred after that date. *See Jajeh v. County of Cook*, 678 F.3d 560, 571 (7th Cir. 2012).

The next question is whether Williams suffered an adverse action. The standard for proving an actionable adverse action is lower for a retaliation claim than it is for a discrimination claim. *Chaib v. Indiana*, 744 F.3d 974, 986 (7th Cir. 2014); *accord Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) ("The range of conduct prohibited under the anti-retaliation provision is broader than its anti-discrimination provision.")

In contrast to a discrimination claim, the adverse action for a retaliation claim does not have to relate to the terms, compensation, conditions, or privileges of employment. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.")   Instead, "a plaintiff must only show that the employer's action would cause a reasonable worker to be dissuaded from making or supporting a charge of discrimination."   *Chaib*, 744 F.3d at 986–87 (citing *Burlington Northern*, 548 U.S. at 68).

Williams claims that he "was physically threatened . . . [and] suffered continued harassment after he engaged in a protected activity" (Doc. 64-1, p. 9).   But he does not cite to any evidence to support this argument, and the Court's own review of the evidence did not reveal any such instances.   Furthermore, Williams admitted in his deposition that he has not had any overt, direct confrontations with co-workers since he filed his EEOC charge (Doc. 64-13, p. 8).

Williams also claims that his co-workers continue to isolate him and shut him out of communications (Doc. 60-1, p. 72).   The Court is dubious that this conduct constitutes a materially adverse action.   The Seventh Circuit has acknowledged that it is possible for retaliatory ostracism by co-workers to rise to the level a materially adverse action if it is sufficiently severe, and the employer ordered it, or knew about it and failed to properly respond.   *See Baker v. Henderson*, 215 F.3d 1329, at *7 (7th Cir. 2000) (unpublished decision); *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001); *Parkins v. Civil Constructors,* 163 F.3d 1027, 1039 (7th Cir. 1998); *Knox v. State of Ind.*, 93

F.3d 1327, 1334 (7th Cir. 1996).   That being said, Title VII "does not set forth a general civility code for the American workplace" and it does not protect employees from normal petty slights, minor annoyances, or the simple lack of good manners.   *Burlington Northern*, 548 U.S. at 68.

The conduct that Williams describes—excluding him from conversations, acting standoffishly, avoiding him, etc.—does not rise to the rise to the level of a materially adverse action required to support a claim of retaliation.   The conduct, while surely unpleasant and disturbing, does not seem severe.   Rather, it seems like the type of petty slight or minor annoyance that often takes place at work but does not deter reasonable employees from complaining about discrimination.   Additionally, Williams does not argue or present any evidence that the ostracism by his co-workers was ordered by one of his supervisors or that the Company knew he was being ostracized and responded negligently.[8]

Even if the conduct did constitute a materially adverse action, Williams has not

---

[8] *Compare Knox v. Indiana*, 93 F.3d 1327, 1331, 1335 (7th Cir. 1996) (finding adverse action sufficient to support retaliation claim where multiple co-workers engaged in "relentless campaign" of vicious gossip and profanity at the direction of a supervisor who wanted to make plaintiff's life "hell" after she complained that supervisor sexually harassed her) *with Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) ("Personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under Title VII.") (internal quotation marks and citations omitted); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (holding employee's allegations that her supervisors gave her the "cold shoulder," sat farther away from her at meetings, became too busy to answer her questions, generally tried to avoid her, and urged her not to consult an attorney were insufficient to support retaliation claim); *Recio v. Creighton Univ.*, 521 F.3d 934 (8th Cir. 2008) (holding alleged ostracism experienced by university professor, including "silent treatment" from other faculty and being excluded from picture of Spanish faculty posted on website, was insufficient to support retaliation claim); *Mlynczak v. Bodman*, 442 F.3d 1050 (7th Cir. 2006) (holding co-workers' shunning of employee who filed discrimination complaints did not violate anti-retaliation statute).

put forth any evidence, direct or circumstantial, to show a causal connection between the conduct and the filing of his EEOC charge.   The Supreme Court has recently interpreted Title VII's retaliation provision to require proof of but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).   The evidence in this case, even when viewed in the light most favorable to Williams, unequivocally shows that the tensions and animosities between Williams and his co-workers existed long before he filed his EEOC charge, and they continued to fester after he filed the charge.   Simply put, Williams would have been ostracized by his co-workers even if he had not filed the EEOC charge.   No reasonable jury could infer that the EEOC charge was the "but-for" cause of Williams's co-workers ostracizing him.

In conclusion, Williams has failed to establish that he suffered an adverse employment action because he filed a charge with the EEOC.   Accordingly, Phillips 66 is entitled to summary judgment on the claim for retaliation.

## C.  Intentional Infliction of Emotional Distress

Williams asserts a claim for intentional infliction of emotional distress ("IIED") under Illinois common law in Count Four of the amended complaint (Doc. 30). Unfortunately, Phillips 66 again takes the "kitchen sink" approach to this claim.

Phillips 66 first argues that Williams's IIED claim is pre-empted by the Illinois Human Rights Act ("IHRA") (Doc. 60, p. 18).   The Company states the legal standard for pre-emption by the IHRA, and then seemingly suggests that the Court consult an order issued by another judge for the requisite analysis.   The Court cannot grant summary judgment based on such a poorly developed argument.   Additionally, the

Court finds this argument wholly disingenuous.   Phillips 66's position throughout its entire brief up to this point was that the actions of Williams's co-workers could not serve as the basis of a Title VII claim because they were *not race-related*, and thus did not violate the Company's duty not to discriminate against Williams on the basis of his race.   In order to make an argument for pre-emption by the IHRA, however, Phillips 66 has to talk out the other side of its mouth and argue that the actions were solely and entirely due to Williams's race.   *See Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602–05 (7th Cir. 2006).   The Company cannot have it both ways.

Phillips 66 next argues that Williams's IIED claim is pre-empted by the Illinois Workers' Compensation Act (Doc. 60, pp. 18–19).   Phillips 66 states the elements necessary to show pre-emption, and then conclusively states "Plaintiff clearly alleges that his emotional distress arose out of his employment" (Doc. 60, p. 19).   This one-sentence analysis is insufficient to convince the Court that the Illinois Workers' Compensation Act—a state statute designed to protect employees injured in work place accidents—was the proper avenue for Williams to seek relief related to his co-workers' torment.

Next, Phillips 66 turns to the merits of the IIED claim and argues that it is entitled to summary judgment because Williams failed to put forth evidence of severe emotional distress (Doc. 60, pp. 19–20).   This argument is also minimally developed, but it nevertheless has some promise.   Under Illinois law, a plaintiff claiming intentional infliction of emotional distress must prove that the defendant intentionally or recklessly

engaged in extreme and outrageous conduct that caused severe emotional distress. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006). "Severe emotional distress" is distress so severe that no reasonable person could be expected to endure it. *Lifton v. Bd. of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005).

Phillips 66 points out that Williams testified that "he has no desire to leave the Refinery or even move to a different department, he likes his job as an operator, and he has not sought any type of medical treatment as a result of his work experiences" (Doc. 60, p. 20). In his response, Williams argues that "there are overwhelming material facts to find Defendant liable because . . . severe emotional distress was suffered by Plaintiff" (Doc. 64-1, p. 17). Williams does not identify the "severe emotional distress" that he allegedly suffered, however, and he does not support his assertion with any citation to the statement of facts or to the record. Williams has an obligation to "identify with reasonable particularity the evidence upon which [he] relies." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003)); *accord* Fed. R. Civ. P. 56(c)(1). He did not do so, and therefore, he failed to satisfy his burden of setting forth specific facts showing that there is genuine issue for trial. Accordingly, Phillips 66 is entitled to summary judgment on the claim for intentional infliction of emotional distress ("IIED").

### 5. Punitive Damages

A Title VII plaintiff is entitled to punitive damages if his employer engaged in discriminatory practices "with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1). There is a three-part framework for

determining whether an award of punitive damages is proper under the statutory standard. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857–58 (7th Cir. 2001) (citing *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526 (1999)).   First, the plaintiff must show that the employer acted with the requisite mental state; that is the employer acted "in the face of a perceived risk that its actions will violate federal law."   *Bruso*, 239 F.3d at 857 (citing *Kolstad*, 527 U.S. at 536).   Second, the plaintiff must establish a basis for imputing liability to the employer.   *Bruso*, 239 F.3d at 858 (citing *Kolstad*, 527 U.S. at 539).   Third, even if the plaintiff establishes the first two parts of the test, the employer can escape liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy.   *Bruso*, 239 F.3d at 858 (citing *Kolstad*, 527 U.S. at 539).

Although Phillips 66 did not explain which prong of the *Kolstad* framework its argument pertains to, it appears to the Court that the argument pertains to the third prong—whether it engaged in good faith efforts to implement an antidiscrimination policy.   Phillips 66 points out that "each time [Williams] complained about his co-workers, [the Company] took the allegations seriously, promptly investigated the allegations, and took measures to address the complaint" (Doc. 60, p. 17).   Furthermore, Phillips 66 had "robust, written policies to prevent harassment, and has repeatedly conducted training of [Williams's] co-workers" (Doc. 60, p. 18).

The mere existence of a formal antidiscrimination policy is not sufficient to insulate an employer from a punitive damages award.   *May v. Chrysler Group, LLC*, 716 F.3d 963, 975 (7th Cir. 2012); *Bruso*, 239 F.3d at 858.   The employer must also put forth

evidence that it educated its employees about the policy and actively enforced its mandates.  *See May*, 716 F.3d at 975; *see Bruso*, 239 F. 3d at 858 n.4.  As previously discussed in this Order, however, the evidence regarding the Company's investigations, such as when they were launched and what they entailed, is scant, and the evidence regarding the actions that the Company purportedly took to stop or prevent further harassment is virtually nonexistent.   Because Phillips 66 has offered little to no factual support for its argument, the Company has failed to meet its initial burden in moving for summary judgment.   Accordingly, Phillips 66's motion for summary judgment on the availability of punitive damages is denied.

## CONCLUSION

Phillips 66's motion to strike (Doc. 67) is **DENIED as moot**.   Phillips 66's motion for summary judgment (Doc. 59) is **GRANTED in part, and DENIED in part**.   Counts One, Three, and Four of the amended complaint are **DISMISSED with prejudice**.   This case will proceed only on Count Two for hostile work environment.

The Clerk of Court is **DIRECTED** to correct the docket sheet to reflect the proper name of Defendant: Phillips 66 Company.

The final pre-trial conference and presumptive trial month will be reset by separate order.

**IT IS SO ORDERED.**

**DATED:   November 3, 2014**

**s/ Nancy J. Rosenstengel**
**NANCY J. ROSENSTENGEL**
**United States District Judge**